**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

HEALTHPARTNERS, INC., HEALTHPARTNERS ADMINISTRATORS, INC., MEDCENTERS HEALTH CARE, INC., and GROUP HEALTH PLAN, INC.,

Plaintiffs,

v.

AETNA HEALTH MANAGEMENT, INC. and AETNA U.S. HEALTHCARE, INC.,

Defendants.

Civil No. 00-1895 (JRT/FLN)

**MEMORANDUM OPINION**

---

Cooper S. Ashley, Michael C. McCarthy, and Laura E. Walvoord, MASLON, EDELMAN BORMAN & BRAND, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, for plaintiffs.

Timothy D. Kelly and Erin K. Fogarty Lisle, KELLY & BERENS, P.A., 3720 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for defendants.

This is a breach of contract action between plaintiffs (collectively, "HP") and defendants (collectively, "Aetna"), a company that formerly provided administrative services to HP such as billing and customer service. HP alleges that Aetna breached the parties' contract because it failed to provide newer versions of certain computer software upon the termination of their relationship. On March 31, 2003, the Court issued an Order

JUN 19 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD.
DEPUTY CLERK

granting in part and denying in part both Aetna's motion for summary judgment and HP's motion for partial summary judgment. The Court now issues this memorandum opinion to explain its reasoning.

## BACKGROUND

### I. The Parties and Their Relationship

HP is an Health Maintenance Organization. Aetna contracted to provide administrative services such as billing and customer service to HP. The contract between the parties consisted of a Master Agreement and a series of Administrative Service Agreements (together, the "Agreements"). HP's claims in this case relate to Section 4.3 of the Master Agreement ("Section 4.3") and Exhibit 1.5.1 to the Administrative Service Agreements ("Exhibit 1.5.1").

Section 4.3 provides in relevant part:

> [Aetna] shall maintain the computerized management information system ("MIS"), as described in Exhibit 1.5 of the Administrative Agreements, in good working order and as necessary for the continuation of reliable and efficient operation of MIS, and for purposes of performing the services under the Administrative Agreements. . . . Basic system support, as identified in Exhibit 1.5.1 of the Administrative Agreements and such other equipment and software maintenance necessary to perform the services under . . . the Administrative Agreements shall be provided by [Aetna].

(Lisle Aff. Ex. 1 ("Master Agreement") § 4.3).) Exhibit 1.5.1, entitled "Basic Support Services for Aetna Systems," provides in relevant part that Aetna shall be responsible for:

> A. Maintenance and upgrade of the operating system software to ensure hardware and operating system maintenance by the compute vendor or reputable third party.

> B. Modification and upgrade of the layered software necessary to maintain compatibility with new operating system releases.
>
> . . .
>
> E. Upgrade of Third Party Applications Software to maintain currency with supported vendor releases where vendor is still supporting the product. Upgrades to be performed within 12 months of new vendor release unless mutually agreed.

(Lisle Aff. Ex. 3 ("Exhibit 1.5.1").)

As part of its services to HP, Aetna created a computing platform called "Aetna Systems." Aetna used Aetna Systems to provide service to one of HP's largest customers. The software components that are the subject of this case are all parts of Aetna Systems.

HP eventually decided to perform administrative services such as billing and customer service in-house, and on April 20, 1997, HP terminated the Agreements with Aetna, effective March 31, 1998. In order to provide "seamless" service to its customers, HP decided to acquire Aetna Systems and continue operating them itself. This required HP to hire and train personnel, and to acquire software and hardware to run Aetna Systems. The business portion of the transition occurred in March 1998, and the systems were actually switched over to HP in July 1998. The Agreements provided that Aetna would have no duty to maintain or upgrade any systems after the termination date.

## II. Relevant Software and HP's Claims

This lawsuit revolves around several pieces of software that were part of Aetna Systems. Understanding the legal claims in this case requires a brief discussion of the software.

### 1. Operating Systems

Operating systems are software that runs a computer. Aetna Systems ran on an operating system called "MVS," created by IBM. When Aetna Systems was transferred from Aetna to HP, Aetna Systems ran on MVS version 4.3. One year after the transition, HP upgraded MVS 4.3 to an operating system that was even newer, called "OS/390."

### 2. Applications

Applications are programs that perform particular functions (i.e. word processing, database, etc.) There are several applications at issue in this case: (1) "ClaimFacts;" (2) "CyCare C800;" and (3) "Customer Service."

#### a. ClaimFacts

Claim Facts is a third-party application sold by the Erisco company. Prior to the transition, Aetna Systems ran on ClaimFacts version 4.7. HP claims that Aetna was required to have upgraded to version 5.2 prior to the transition. ClaimFacts 5.2 was released by its manufacturer in November 1996. The transition took place in March 1998.

**b. CyCare C800 and Customer Service**

CyCare C800 ("CyCare") and Customer Service provided billing and customer service functions, respectively. CyCare was a third-party product, while Customer Service was created by Aetna. Aetna did not replace or upgrade these applications prior to the transition. After the transition, HP replaced each of these products with another application. The Agreements do not specifically require Aetna to upgrade CyCare or Customer Service. HP argues that Aetna nonetheless was required to replace these applications because they depended upon another type of software that Aetna was contractually bound to update. This other software is called "layered software."

**3. Layered Software – CICS**

Layered software helps operating systems and applications communicate with each other. The relevant layered software in this case is called CICS. At the transition, Aetna Systems used CICS version 2.1.2. Newer versions of CICS are incompatible with the CyCare and Customer Service software.

## ANALYSIS

## I. Count I – ClaimFacts

Both parties seek summary judgment on this count, which revolves around whether Aetna was required to upgrade the ClaimFacts application. HP claims that Aetna was required to deliver a newer version, MVS 5.02.2. Aetna concedes that it was obligated to upgrade ClaimFacts, but argues that when it tried to perform this upgrade, HP instructed it not to do so. Aetna claims that it is excused from performing under the contract because:

(1) HP waived its right to a ClaimFacts upgrade; (2) HP is estopped from claiming any damages; and (3) HP prevented and hindered Aetna from performing its contractual obligations.

**A. Waiver**

It is undisputed that the Agreements required Aetna to upgrade ClaimFacts. Aetna contends, however, that it prepared to upgrade ClaimFacts, but that HP instructed Aetna not to perform the upgrade. Aetna claims that in doing so, HP waived its rights to the upgrade. As evidence, Aetna points primarily to a January 19, 1998 letter from HP to Aetna, in which HP instructed Aetna not to proceed with the ClaimFacts upgrade. The letter explained that after several delays in the upgrade, it was too late for Aetna to successfully upgrade ClaimFacts while also preparing a smooth transition of the entire Aetna Systems. The letter added that its "request that Aetna cease all efforts to upgrade and implement [ClaimFacts] should not be construed in any way as a waiver by HealthPartners of its legal or equitable rights." (Lisle Aff. Ex. 29.) Despite this statement, and a non-waiver provision in the Agreements, Aetna argues that this letter constituted a waiver of HP's right to the upgrade.

Where, as here, the facts are undisputed, the determination of waiver may be made on summary judgment. *Montgomery Ward & Co. v. County of Hennepin*, 450 N.W.2d 299, 304 (Minn. 1990). For an "action to constitute waiver, it must be an intentional relinquishment of a known right, and must be clearly made to appear from the facts disclosed." *Citizens Nat'l Bank of Madelia v. Mankato Implement, Inc.*, 441 N.W.2d

483, 487 (Minn. 1989). The party claiming waiver must prove it by clear and convincing evidence. *Johnson v. Brakemeier*, 1996 WL 5820 at *2 (Minn. Ct. App. Jan. 9, 1996).

Aetna cites several cases in support of its waiver argument. The Court finds that none of these cases are on point, because none of them involves an express reservation of rights like that contained in HP's January 19, 1998 letter. For example, in *Citizens National Bank*, the Minnesota Supreme Court held that a bank's granting a borrower oral permission to dispose of collateral waived the bank's right to approve all such dispositions in writing. *Citizens Nat'l Bank*, 441 N.W.2d at 484-85. The court premised its finding of waiver, however, upon facts that "clearly evidenced the bank's intent to waive its right." *Id.* at 487. Unlike the present case, in *Citizens National Bank* there was no evidence that the bank attempted to preserve its rights.

Aetna also relies upon *Appollo v. Reynolds*, 364 N.W.2d 422 (Minn. Ct. App. 1985). That case involved a real estate purchase agreement, which provided that the sellers would pay no more than five points and would close on a particular date. *Id.* at 423. When the closing date was delayed, the sellers argued that they were not bound by the contract because the points on the original closing date were more than five. *Id.* The court held that because the sellers still urged performance of the contract by the purchasers, the sellers waived their rights to the condition precedent regarding points. *Id.* at 424. The court held that by ignoring the relevant provision in the contract, the sellers waived it. *Id.* ("Ignoring a provision in a contract will constitute waiver.") In the present case, HP did not ignore any provisions, but rather expressly noted that it was not waiving any rights. Therefore, *Appollo* is inapposite.

Finally, Aetna's citation of a decision of this Court, *Steward v. Up North Plastics*, 177 F. Supp. 2d 953 (D. Minn. 2001), does not apply for similar reasons. There, the Court held that plaintiff waived a forum selection clause by bringing suit in a different forum, effectively waiving the clause. *Id.* at 958.

Aetna has produced no evidence other than the January 19, 1998 letter to show waiver. The Court finds that this does not constitute clear and convincing evidence that HP intentionally waived its rights to the ClaimFacts upgrade.

**B. Estoppel**

Aetna next argues that HP is estopped from claiming damages based on Aetna's failure to upgrade ClaimFacts. To prove equitable estoppel, Aetna must show that: (1) HP made promises or inducements; (2) Aetna reasonably relied upon those promises; and (3) Aetna will be harmed if estoppel is not applied. *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919 (Minn. 1990). *See also Noske v. Noske*, 73 F. Supp. 2d, 1025, 1029 (D. Minn. 1999).

Aetna claims that it relied upon HP's January 1998 letter in ceasing to perform the ClaimFacts upgrade. Although Aetna makes a variety of suggestions about what HP knew regarding Aetna's ability to perform the upgrades, Aetna produces no evidence that it reasonably relied upon HP's letter in failing to perform the upgrade. Moreover, HP's letter did not come until several months **after** Aetna's performance on the upgrade was due. A party cannot demonstrate detrimental reliance when the conduct allegedly relied upon occurred after the time for performance. *See* 13 Williston on Contracts § 39:19 (4th

ed.) It is undisputed that performance of the upgrade was due in November 1997. The letter upon which Aetna claims to rely was not sent until January 1998. The Court finds that because Aetna produces no evidence that it detrimentally relied upon any actions of HP before November 1997, HP's claims are not barred by equitable estoppel.

### C. Hindered Performance

Finally, Aetna argues that HP prevented it from upgrading ClaimFacts. In support, Aetna again cites the January 1998 letter instructing Aetna to cease work on the ClaimFacts upgrade. "[C]ontract performance is excused when it is hindered or rendered impossible by the other party." *Zobel & Dahl Construction v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984). *See LaSociete Generale Immobiliere v. Minneapolis Community Development Agency*, 44 F.3d 629, 638 (8th Cir. 1994). However, hindered performance is not legally possible where the alleged hindrance does not occur until after the time for performance has expired. *See City of Plymouth v. Begin*, 1993 WL 290271 at *3 (Minn. Ct. App. Aug. 3, 1993) (holding that party could not have prevented opponent from completing a contract where party's actions occurred after contract expired); *Winthorp Resources Corp. v. Anastasi Construction Co., Inc.*, Civ. No. 01-787, slip op. at 7-8 (D. Minn. March 18, 2002) (holding that defense of impossibility of performance is invalid where liability for breach of contract occurred prior to events underlying defense of impossibility). As stated above, Aetna was required to perform the ClaimFacts upgrade by November 1997. The letter that HP claims hindered its performance was not sent until January 1998. Therefore, Aetna's arguments in this regard also fail.

For the reasons stated above, the Court found that HP did not waive its rights under the contract, that its claims are not barred by estoppel, and that it did not hinder Aetna's performance of its duty to upgrade ClaimFacts. Therefore, the Court granted HP's motion and denied Aetna's motion for summary judgment on Count I.

## II. Count II – MVS Operating System

Only Aetna seeks summary judgment on this Count, which involves Aetna's alleged obligation to upgrade the MVS operating system. In particular, the parties disagree over which contractual provision – Section 4.3 or Exhibit 1.5.1 – primarily governs the duty to upgrade MVS. The parties also disagree over the interpretation of these provisions.

HP argues that both § 4.3 and Exhibit 1.5.1 must be considered in determining the duty to upgrade MVS. Section 4.3 requires that Aetna Systems be kept "in good working order . . . as necessary for the continuation of reliable and efficient operation of" Aetna Systems. (Master Agreement § 4.3.) HP argues that Aetna breached this provision because Aetna Systems operated poorly prior to the transition, regularly crashing and freezing. In order to comply with § 4.3, HP contends, Aetna should have upgraded MVS to a newer version. Aetna disputes the degree to which the systems crashed, and argues that any malfunctions did not prevent Aetna Systems from being generally "reliable and efficient."

Aetna also disputes that § 4.3 applies to MVS upgrades. Aetna contends that Exhibit 1.5.1 governs such upgrades, noting that it is more specific than § 4.3. Rather

than discussing the general "good working order" of all Aetna Systems, Exhibit 1.5.1 specifically requires "[m]aintenance and **upgrade of the operating system software** to ensure hardware and operating system maintenance by the computer vendor or reputable third party." (Exhibit 1.5.1 ¶ A) (emphasis added). Aetna argues that it satisfied this provision, because MVS 4.3 was supported by IBM until June 1999, one year after the transition. HP argues that if Aetna is correct that the duty to upgrade MVS is governed exclusively by Exhibit 1.5.1, then § 4.3's requirement of "good working order" is left without meaning.

In these circumstances, the Court must apply two established canons of contractual interpretation. General principles of interpretation hold that a more specific contractual provision takes precedence over more general provisions. *See Corso v. Creighton Univ.*, 731 F.2d 729, 733 (8th Cir. 1984). Another canon of construction holds that no piece of contractual language should be construed as meaningless. *Opus Corp. v. International Business Machines, Inc.*, 141 F.3d 1261, 1266 (8th Cir. 1998). That both of these canons are valid in this case highlights that a genuine issue of material fact exists as to which portion of the contract was intended to apply to MVS upgrades. Likewise, a genuine issue of material fact exists as to the extent to which Aetna systems operated properly. Because these factual issues remain outstanding, the Court cannot grant Aetna's motion for summary judgment on Count II.

## III. Counts III and IV – CICS, CyCare, and Customer Service

Both parties seek summary judgment on Counts III and IV, which allege that Aetna was required to replace the CyCare and Customer Service software. HP concedes that the Agreements do not explicitly require Aetna to upgrade CyCare and Customer Service. HP contends, however, that Aetna was obligated to upgrade CICS, and therefore it also had to replace CyCare and Customer Service. Exhibit 1.5.1 provides that Aetna is responsible for "[m]odification and upgrade of the layered system software necessary to maintain compatibility with **new operating system releases**." (Exhibit 1.5.1 ¶ B (emphasis added).)

HP notes that IBM released a new operating system, called OS/390, in March 1996, two years before Aetna Systems were transferred to HP. It is undisputed that OS/390 was not compatible with the version of CICS that Aetna systems was running at the time, version 2.1.2. HP contends that IBM's release of OS/390 triggered a duty by Aetna under Exhibit 1.5.1 ¶ B to upgrade CICS to a version compatible with the new operating system. HP also alleges that upgrading CICS is not the end of Aetna's duties.

As discussed earlier, Aetna Systems was an integrated computer system consisting of several pieces of software. One aspect of the Systems was that the CyCare and Customer Service components worked only with the older version of CICS, version 2.1.2. HP thus contends that in order to maintain the functionality of Aetna Systems, if Aetna upgraded CICS – as HP contends it was required to do – Aetna would also have to replace CyCare and Customer Service.

Aetna disagrees with the basis of this reasoning by disputing HP's interpretation of Exhibit 1.5.1 ¶ B. Aetna contends that "new operating system releases" refers only to those new operating systems that Aetna **actually installed**. Thus, Aetna argues that because it did not install a new operating system, it was not required to upgrade the layered software, and therefore had no need to replace or upgrade CyCare and Customer Service.

The parties have introduced evidence designed to show what Aetna and HP knew and intended in forming the contractual provisions that govern the duty to upgrade layered software. The Court finds that this evidence presents genuine issues of material fact as to the applicability of Exhibit 1.5.1 ¶ B and other provisions. Therefore, the Court has denied both parties' motions for summary judgment on Counts III and IV.

## IV. Count V – Historical Data and Tapes

As stated in the Court's March 31, 2003 Order, the Court has deferred ruling on the parties' motions for summary judgment on Count V, which deals with Aetna's alleged duty to return tapes containing HP's data. The Court has nothing to add to its discussion in that Order, but reiterates its belief that this issue can yet be resolved between the parties. The Court therefore ordered the parties to meet and confer to try to resolve this dispute.

DATED: June 19, 2003
at Minneapolis, Minnesota.

John R. Tunheim

JOHN R. TUNHEIM
United States District Judge